CAVANAGH, J.
(dissenting). Imposing a bizarre semantical construct on Const 1963, art 8, § 9, and ignoring the circumstances surrounding its ratification, the majority’s decision in this case divests Michigan citizens who reside in a town that does not have a library of their constitutional right to borrow books from other *570 libraries. Despite the clear mandate from the people of this state that libraries “shall be available to all residents of the state,” Const 1963, art 8, § 9, the majority decides that as long as libraries are “generally” available, the constitutional obligation is fulfilled. The majority accomplishes this through an unusual analysis that fails to account for the history of and purpose behind the constitutional amendment. In doing so, the majority attributes a trade-off to the people of this state that the people did not make. Thus, I dissent.
To obtain a true understanding of what the constitutional language means and how it must be enforced, one must actually consider the people’s understanding of what it meant to have our libraries “available,” for it is the people’s understanding of the amendment at the time they ratified it that governs the analysis. One cannot, as the majority does, ante at 561-566, consider concerns that may have arisen later or that exist today, such as policy issues or hypothetical financial considerations. Nor may we look to other constitutional provisions or later-enacted legislation as clues to the amendment’s meaning. See ante at 561-562. Rather, the people’s understanding is properly evaluated in a way we have explained as follows:
In interpreting the constitution, this Court has developed two rules of construction. First, the interpretation given the constitution should be “the sense most obvious to the common understanding”; the one which “reasonable minds, the great mass of people themselves, would give it”. Traverse City School Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971); Council No 11, AFSCME v Civil Service Comm, 408 Mich 385, 405; 292 NW2d 442 (1980) (quoting Cooley’s Const Lim [6th ed], p 81). Secondly, “the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished may be considered”. Traverse City School Dist, 384 Mich 405. See Kearney v Board of State Auditors, *571 189 Mich 666, 673; 155 NW 510 (1915). [Soap & Detergent Ass’n v Natural Resources Comm, 415 Mich 728, 745; 330 NW2d 346 (1982).]
Although the majority acknowledges the existence of this standard, ante at 558-559, and at least purports to apply it to conclude that the people understood libraries to be lending institutions,[1] the majority makes no further mention of these principles as it proceeds to decide how the concept of “availability” must be interpreted. Thus, the majority reaches the unexplained (and inexplicable) conclusion that the people intended that libraries would “in general” be available.
The majority’s core analytical misstep occurs ante at 559-560, where it states,
However, we disagree with plaintiffs premise that Const 1963, art 8, § 9 requires that each individual public library facility in Michigan must be “available” on identical terms to all residents of the state. Rather than addressing the obligations of individual library facilities, this provision is better understood, in our judgment, as assuring the availability of public libraries in general. That is, the Legislature shall make public libraries available, not necessarily each individual library facility. Const 1963, art 8, § 9 does not refer to “each and every” public library or to “individual” public library facilities, but refers only to the legislative obligation to provide for the “establishment and support of public libraries.” By this use of the plural, as well as the use of the broad terms “establishment and support,” we believe that the constitution refers to “public libraries” as an entiiy i.e., public libraries as an institution. It is this entity, this institution — the public library — that must be made “available” to all residents, not each individual library facility.
*572 I must echo what every reader must now be thinking: “What?” On what basis is the majority’s conclusion reached? And why does the majority rely only on its “belief” of what the provision means, rather than on its belief of what the people believed it meant? What exactly are “generally available” libraries? The authority on which the majority’s conclusion is drawn is glaringly absent.
I fail to see the relevance of the other constitutional provisions the majority proffers to support its conclusion. The people’s intent with respect to Const 1963, art 8, § 9, is not assessed by reference to Const 1963, art 8, § 1, a provision regarding “schools and the means of education,” or Const 1963, art 8, § 8, a provision regarding institutions, programs, and services for the disabled. Moreover, the majority’s attempt to analogize the three provisions is a stretch so thin it defies credibility. And the majority should review Const 1963, art 8, § 2, which states in part, “The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law.” Under the majority’s rationale, this provision would mean that schools should be “generally available,” but would stop short of guaranteeing that every student has a right to have a school fully available to him. Further, Const 1963, art 8, § 1, is a general statement that espouses the importance of education in general, while the subsequent provisions of article 8, such as § 2 (schools) and § 9 (libraries), detail the specific means by which education will be promoted.
The majority’s subsequent orations on library funding issues are not only irrelevant to the analysis, but they also demonstrate a critical misunderstanding of the issue at hand. The majority fails to grasp that the interpretation of “available” is not subject to post- *573 ratification whims of the Legislature, courts, or governing boards of libraries. It is not the Legislature’s province to determine “that the ‘availability’ of public libraries is best achieved through the institutions of local control and the encouragement of cooperative agreements.” Ante at 565. Rather, the meaning of the term “available” was set when the people ratified Const 1963, art 8, § 9, and that meaning is not now modifiable. Under the clear language of the constitutional provision, the Legislature is to enact laws that “establish” and “support” public libraries, which libraries must be “available” to all people. Nothing in the language allows any entity to alter the meaning of “available” or govern its scope after the fact. Moreover, we are not to determine what meaning of “available” makes the most sense today, as the majority prefers to do, but how that term was understood in 1963.
Rather than being charged with determining what it means to have libraries available, the constitutional provision requires the Legislature to enact laws that establish our public libraries and to develop ways in which those libraries can be supported, while the local library boards may promulgate regulations relating to the logistical and administrative tasks intrinsic to running a library, including the process for lending books to nonresidents who are not otherwise covered by a cooperative agreement. Const 1963, art 8, § 9; see also OAG, 1983-1984, No 6,188, p 195 (October 17, 1983). The distinction, though fine, and though missed by the majority, is material. Local library boards may adopt rules that assist them with administering the libraries in the process of making them “available.” For instance, local library boards might regulate the number of books that can be borrowed at one time, the cost of borrowing fees, or the length of time a book can be borrowed. Similarly, library boards can regulate the use of their *574 meeting rooms, the length of time one can use a computer, or the hours the library will be open. They cannot, however, impede the fundamental principle of “availability” as that term was understood when ratified.
Thus, we must determine what sense of the “availability of libraries” was most obvious to the common understanding of the great mass of the people of this state. Soap & Detergent, supra at 745. Having conducted my own inquiry into the people’s intent, I agree with the majority that the understanding most common to the people was that libraries were lending institutions. But the analysis cannot end there; rather, we must also examine the “ ‘circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished,’ ” Soap & Detergent, supra at 745, quoting Traverse City School Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971), to reach an understanding of what it meant to the people to have these lending libraries “available.” Although such an analysis would lead to the conclusion that the people ratified a constitutional provision that would do more than promote some ethereal sense that lending libraries would “in general” be available, whatever that might mean, the majority blatantly ignores the people’s understanding and in fact, as noted, makes no inquiry into it whatsoever.
In construing the meaning of a constitutional provision with the ultimate goal of discerning the people’s intent, “the technical rules of statutory construction do not apply.” Traverse City School Dist, supra at 405, citing McCulloch v Maryland, 17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819). Further,
“it is not to be supposed that [the people] have looked for any dark or abstruse meaning in the words employed, *575 but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.’ ” [Id., quoting Cooley, Constitutional Limitations, p 81 (emphasis in original).]
The majority’s theory about “general availability” and plural and singular word forms are hypertechnical conclusions that run roughshod over the principle explained by Justice Cooley. The majority’s interpretation is both a dark and abstruse meaning that is quite opposite to the sense most obvious to the common understanding. At the time this amendment was ratified, in the face of language that read, “The legislature shall provide by law for the establishment and support of public libraries which shall be available to all residents of the state ...,” the people of Michigan certainly did not understand that language to convey an indeterminate promise that libraries would “in general” be available, which, in the majority’s view, means merely that some library somewhere in the state must lend books. Rather, basic common sense dictates that this wording guaranteed actual availability of libraries to all people in the sense that each library would be available for each citizen’s use. Indeed, the people ratified a constitutional provision that mandated the availability of lending institutions to “all citizens,” not “some citizens” or just citizens who are under a library service agreement.
The majority’s declaration that when ratifying the constitutional amendment, the people believed they were ratifying a provision that would replace their indelible right to full library access with an impotent “right” to have the availability of libraries “generally” encouraged, almost hints of a shell game. Moreover, the majority violates a cardinal rule of construction by adding words to the provision. Rather than seek the *576 dark or abstruse meaning, or assume that the people parsed the language and came to this agreement on its grammar, syntax, and semantics, I would heed the axiomatic principles that guide us in determining the meaning behind a constitutional provision. The commonsense meaning must be imposed, and the circumstances surrounding the amendment must be examined.
I must note the irony of the majority’s conclusion that the citizens would have understood libraries to be. lending institutions, which is clearly a commonsense interpretation, contrasted with its peculiar conclusion that the people would have understood “availability” as a term that did not guarantee availability to each citizen, which is clearly not a commonsense interpretation. The majority swings twice but hits only once.
Having discussed the commonsense meaning behind the provision, which, in my view, is easily detectable, I turn now to the circumstances that existed during the time the constitutional provision was proposed and ratified. The circumstances surrounding the promulgation of article 8, § 9, were captured in the record made of the discussion and debates about the constitutional amendment at the constitutional convention. Before the 1963 constitutional amendments were ratified, the previous constitution required each Michigan township and city to maintain at least one public library. Const 1908, art 11, § 14. Sparking the committee on education’s proposed revisions to that mandate was the reality that many townships and cities were not maintaining a public library, mostly for financial reasons. Thus, the delegates sought to relieve townships and cities of the burden of maintaining a library while still preserving the right of the people to access a library. See, generally, 1 Official Record, Constitutional Convention 1961, pp 822-837.
*577 Of paramount concern, as reflected in the transcript of the convention debate, was library funding. Delegates discussed at length the necessity of allowing the Legislature to promulgate regulations that would promote the economic feasibility of reducing the required number of libraries while increasing the number of citizens who may use the libraries. Delegate Alvin M. Bentley, chairman of the committee on education, thoroughly explained that while the time had come to transition from the original constitutional mandate, the new constitutional mandate would not only preserve, but increase library availability:
This section continues the fine Michigan tradition of encouragement and support of public libraries throughout the state, but it does attempt to eliminate some of the confusing elements of the present article XI of section 14. The 1908 constitution states: “The legislature shall provide by law for the establishment of at least 1 library in each township and city;...” This has never been adhered to as a matter of practice. Today, only 1 out of 15 townships has a library.
The present language emphasizes that “public” libraries will be “available” to residents without fixing how or where the libraries themselves shall he organized. The committee presumes that legislation may be written so that each library may make reasonable rules for the use and control of its books.
Under this proposal present libraries will be retained. But to make libraries more available to the people their services may be expanded through cooperation, consolidation, branches and bookmobiles. [1 Official Record, Constitutional Convention 1961, p 822 (emphasis added).]
With financial concerns at the forefront, the scope of privileges that would be afforded to nonresidents using another municipality’s library was thoroughly explored *578 during the debate.[2] Most delegates were clear that the citizens in towns with libraries should not be required to subsidize the costs of nonresidents using their libraries, but, prudently, they left the sorting out of financial details to the Legislature.[3] {“The legislature shall provide by law for the establishment and support of public libraries which shall be available to all residents of the state under regulations adopted by the governing bodies thereof.” Const 1963, art 8, § 9 [emphasis added].)
But not all delegates were convinced that the question of cost-based library use was open on the face of the amendment’s language. Delegate Milton E. Higgs, for example, questioned whether the constitutional language meant not only that making libraries available to all citizens meant that all citizens could borrow books, but that no charge could be assessed for the privilege:
*579 I would say that when you say “which shall be available to all residents of the state” in the constitution, that you could not limit or qualify that in any way by the requirement of a deposit for the use of the book to guarantee its return or anything else. You say “It shall be available to all residents of the state.” This is like saying in a criminal case, “You’ve got a right of appeal.” When you say, “You’ve got a right of appeal,” you’ve got that right whether you’ve got the money to pay for it or not. In fact, if you don’t have the money to pay for it, the county has to provide it in that case, and I say in this case the same thing would apply. [1 Official Record, Constitutional Convention 1961, p 836.]
Indeed, the debate centered primarily on how libraries would be funded under the new language and whether nonresidents would or could be made to pay for using the services, including book lending, of libraries in other municipalities, not on whether nonresidents could borrow books at all. In fact, when the topic of book borrowing was broached, delegate Karl K. Leibrand expressed concern that providing a free “full time library service [to nonresidents], with the circulation of books, [would be] an undue burden.” 1 Official Record, Constitutional Convention 1961, p 834. In response, the chairperson of the subcommittee on libraries of the committee on education, delegate Vera Andrus, explained that contracts between municipalities were one solution to that concern and that the language of the proposed amendment “doesn’t say free.” Id. at 835. Elsewhere in the dialogue, delegate Bentley asked, “[A]s long as a person from any part of the state can come up to your library and conform with your local regulations and rules, he can have that library and its services and its books made available to him. Would you say that that was covered?” Id. at 836. Delegate Higgs responded, “I would say that would be covered.” Id.
*580 These passages and the balance of the debate on the proposal quite clearly evidence that the key concern was, given that library services must be made available to all citizens, how the libraries would pay for the increase in use. As is also clear, the unanimous resolution of that question was to engraft onto the constitutional amendment a grant of authority for the Legislature to promulgate laws that would provide for this support. But the assumption was that library services, free or not free, would be fully available to all citizens.[4] Glaringly absent from the debate is any proffering of the idea that Michigan residents would be unilaterally deprived of the right to borrow books if they live in a community without a library.
In fact, two delegates who were present during and participated in the constitutional convention debates have appeared before this Court as amici curiae to share their recollections of how the proposed constitutional amendment was commonly understood at that time. And in our quest to ascertain the meaning behind the constitutional provision, their thoughts are enlightening and beneficial.[5] Former delegates Tom Downs and Milton Higgs have averred to this Court that the constitutional provision was intended, and was commonly understood, to mean that “the words, ‘available to ALL RESIDENTS OF THE STATE,’ included borrowing books during days and hours the library would *581 normally be open to the public.” Affidavit of Milton E. Higgs, May 25, 2006. Higgs further explained that “it was commonly understood by the delegates that some libraries required a nominal fee for a nonresident of the district reflecting costs ....” Id. And Higgs shed further light on the meaning of the phrase “under regulations adopted by the governing bodies thereof.” He pointed out that those words
were added to committee proposal 31 during the floor debate to allow some flexibility to the word “available” understanding that such regulations be reasonable and that county law libraries although available to the public would be free to continue the practice of limiting circulation of its books so that they would be immediately available for the judge, the lawyers, and the litigants having business with the court when needed. [Id.]
Downs has the same recollections from his participation in the constitutional convention. He recalls “[t]hat the common understanding expressed by the delegates was that the purpose of Article VIII was to insure ready access to the means of education by all citizens of Michigan regardless of area of residency” and that the provision “required public libraries to permit all state residents to borrow books regardless of area of residency.” Affidavit of Tom Downs, May 5,2006. Forty-five years later, both gentlemen agree with what seems clear from the transcript of the constitutional convention debates: the intent behind the constitutional provision was to enlarge citizens’ access to libraries by allowing citizens to use any library in the state and to obligate the Legislature to provide funding for this system.
And the Legislature promptly did address funding matters by enacting a series of regulations that established mechanisms through which adequate funding could be achieved. Probably the most significant of the *582 Legislature’s solutions to the new library system’s financial challenges was the State Aid to Public Libraries Act (SAPLA), former MCL 397.501 et seq., passed in 1965. In the push for the passage of that bill, the Michigan Library Association’s president exhorted the members to continue with the association’s “major effort” toward its “top priority concern with its basic objective: good library service easily available to every citizen of Michigan.” Purdy, The president comments, 29 Michigan Librarian 1, 1 (1963). The president identified the funding proposal as a “concrete, practical step toward such universal access[.]” Id. In fact, the president credited the association’s “rural and small town” members for the passage of the preceding library funding bill of 1937, stating that those members impressed upon the Legislature that they “wanted good library service and demanded that the State accept its share of the responsibility for seeing that they got it.” Id. at 2. This is yet additional evidence of the emphasis that was placed on the availability of full library services to all Michigan citizens, even those in rural areas whose towns could not afford their own libraries.
Amended several times since, the SAPLA is now codified at MCL 397.551 et seq. The SAPLA encourages townships and cities to create coordinated library systems by establishing cooperative library plans. These cooperative plans enable townships and cities to enter into contracts wherein a town without a library pays financial consideration to a town with a library so that the first town’s residents can use the library of the neighboring town. See, e.g., MCL 397.555. Undoubtedly, these cooperative agreements ease the financial burden of allowing nonresidents to use the public library of another town or city.
*583 Not every city and township without its own library, however, would establish a cooperative agreement with another town. So the parameters of a person’s ability to use another town’s library when residing in a town with neither a library nor a cooperative agreement also had to be addressed. When the question regarding the right of a library to refuse service to a nonresident first arose, Attorney General Frank Kelley was asked whether Const 1963, art 8, § 9, affords nonresidents full use of any public library. In light of the language and history of the constitutional provision, the Attorney General sagely concluded that
all public libraries and their facilities shall be available for use by all state residents, subject to reasonable rules governing the use and control of the library facilities. Clearly, under the constitutional mandate, and the Convention debates, supra, the right of state residents to use the facilities of any public library includes not only the right to enter a public library and read books there, but the same right to borrow books that is offered to residents of the community in which the library is established subject to reasonable regulations....
The framers of Const 1963, art 8, § 9, supra, did not intend to create, or perpetuate, a library system where library privileges are not provided to state residents on an equal basis. [OAG, 1979-1980, No 5,739, p 874 (July 15, 1980) (emphasis added).]
Subsequently, after another lengthy analysis of the plain language of the constitutional amendment and the purposes surrounding the amendment as reflected in the convention debates, the Attorney General explained that the fees to borrow books that are charged to a nonresident who is not covered under a cooperative agreement must reasonably reflect the costs incurred by the library in making those privileges available and that the costs must be proportionate “to the cost, direct *584 and indirect, of issuing a library card, facilitating the return of loaned books, and the attendant cost of administration.” OAG, 1983-1984, No 6,188, p 203. This opinion prompted the Legislature to codify the Attorney General’s pronouncements as follows:
A library may charge nonresident borrowing fees to a person residing outside of the library’s service area, including a person residing within the cooperative library’s service area to which that library is assigned, if the fee does not exceed the costs incurred by the library in making borrowing privileges available to nonresidents including, but not limited to, the costs, direct and indirect, of issuing a library card, facilitating the return of loaned materials, and the attendant cost of administration. [MCL 397.561a.]
The Attorney General’s conclusions about the focus of the constitutional convention debates match my own. And the series of events that occurred after Const 1963, art 8, § 9, was ratified demonstrates the consistency with which the meaning of the provision has been understood for more than 40 years. Beginning with the committee on education’s explanations at the constitutional convention and spanning numerous legislative enactments and three attorney general opinions, the unified understanding was and has been that Const 1963, art 8, § 9, allows any Michigan citizen to borrow books from any Michigan public library. To address the resulting fiscal concerns and, thus, protect the libraries’ financial integrity, the Legislature promptly authorized local library boards to assess fees for that privilege.[6]
*585 But despite the categorical evidence that the intent behind the provision was to continue to make libraries fully available to all while removing the burdensome requirement that every township and city maintain a public library, and the striking absence of any evidence to the contrary, the majority decides with the flick of a pen that a citizen without a public library in his town is at the mercy of each individual library across the state with respect to whether he can check out a book. Under the majority’s “rationale,” as long as some library somewhere in the state allows book lending, that is close enough.[7]
And the majority’s philippic response to this dissent entirely ignores that the Legislature has given libraries the authority to assess fees for nonresident book borrowing that reflect the direct and indirect costs of that practice. MCL 391.561a. But even so, the majority’s attention to the purported financial ramifications of *586 nonresident book borrowing is not the concern of this Court. The debate over funding was had, quite thoroughly in my opinion, at the constitutional convention, and the decision was made to place the responsibility for funding fully available libraries squarely in the hands of the Legislature.
The majority seems to be suggesting that nonresident book borrowing would bankrupt the entire library system and compel all public libraries into a downward spiral of decrepitness and decay that will culminate in crumbling buildings and dusty old dog-eared collections that nobody wants to read. See ante at 563-565.1 refuse to credit such thespian antics. The Legislature has an obligation to ensure that the libraries the public has a right to have available are adequately supported. If financial struggles ensue, the Legislature is more than equipped to deal with them, and the people of this state are more than equipped to handle their concerns through the democratic process. Similarly, if the people’s choice to require the full availability of libraries was fiscally unwise, its correction “is not a judicial function, but rather ‘must be left to the people and the tools of democracy: the “ballot box, initiative, referendum, or constitutional amendment.” ’ ” People v Moffett, 464 Mich 878, 895; 633 NW2d 339 (2001) (CORRIGAN, J., dissenting), quoting People v McIntire, 461 Mich 147, 159; 599 NW2d 102 (1999), citing Dedes v Asch, 446 Mich 99, 123-124; 521 NW2d 488 (1994) (RILEY, J., dissenting). See also Michigan United Conservation Clubs v Secretary of State, 464 Mich 359, 389; 630 NW2d 297 (2001) (CORRIGAN, J, concurring); Robinson v Detroit, 462 Mich 439, 474; 613 NW2d 307 (2000) (CORRIGAN, J., concurring). This Court has no place “incentivizing,” “disincentivizing,” or otherwise engaging in any policy decisions with respect to financing. See ante at 563-564 and n 9. In fact, “ignoring] the *587 logic of incentives and disincentives,” as I am accused of doing, ante at 565, is to interpret the constitutional language as written and to avoid engaging in judicial activism.
Moreover, it is the majority who now gives the green “incentivization” light for library boards to politicize their accessibility by creating regulations that reach far further than merely preventing nonresident book borrowing onsite. For example, when Bloomfield Township and the city of Bloomfield Hills could not agree on a price for the renewal of their library service agreement,[8] which failure resulted in city of Bloomfield Hills residents’ loss of borrowing and other privileges at defendant library, defendant commanded a “reciprocal agreement” with 90 other libraries in which those libraries agreed not to lend books to any city of Bloomfield Hills resident. Thus, despite that plaintiff was issued a MichiCard[9] from the Pontiac Public Library, he was refused book borrowing privileges at the Baldwin Public Library and the West Bloomfield Public Library, even though both libraries belong to the network of libraries accepting the MichiCard. Those libraries informed plaintiff that under their agreement with defendant, they “cannot furnish borrowing services to Bloomfield Hills city residents unless they have a valid card from *588 the Bloomfield Township Public Library.” The majority allows this to continue, foisting on our citizens a public library system that is subject to calculated measures to deprive plaintiff and others like him of the full use of libraries. Surely this is not what our citizens envisioned when they ratified a constitutional amendment that was to broaden library availability. Indeed, to plaintiff, who is now denied book borrowing privileges by 90 libraries, libraries are “generally not available.”[10]
It should be borne in mind that the proposed constitutional amendment did not represent a marked change in existing practices. Before the ratification of Const 1963, art 8, § 9, Michigan citizens enjoyed the right to fully and freely use the public library in their town. No new rights were created by the adoption of the constitutional amendment; there was simply a shift in how access to a library would be afforded. Delegate E. L. Cushman shared her thoughts on the impact of the constitutional provision with the Michigan Library Association in an article entitled Libraries in the proposed new state constitution, 29 Michigan Librarian 4, 4-5 (1963):
Michigan differs from most states in that libraries have been mentioned in our constitutions from the first in 1835 through the 1850 document down to the present one of 1908.[11]
The proposed new constitution of 1963 continues and strengthens this tradition. The new wording accomplishes several things:
*589 The addition of the word “support” “acknowledges the growing need for statewide support for public libraries” .... While this need has been recognized by the legislature, the new wording gives it increased emphasis.
The new language recognizes the need for libraries available to all residents of Michigan, whereas now over a million have no access to public libraries.[12]
In brief, the new constitution continues the present systems of organization and financing, while placing increased emphasis on state support of libraries and on the need for statewide library services.
Thus, instead of guaranteeing that the library a person could access would be in that person’s town, the constitutional amendment guaranteed that all libraries would be available to all people. The notion of “availability” — and the attendant rights — remained constant. There is simply no basis on which to conclude, and the majority provides none, that the people of this state understood or agreed that the constitutional amendment meant that libraries would be “generally” available, or that as long as some libraries are fully available to some people, the constitutional mandate is fulfilled.
As defendant itself recognizes, “Clearly, as was set forth in the Address [to the People], the delegates intended for existing libraries to fill the void in service created by the failure of so many local communities to build their own libraries.” (Emphasis added.) In lieu of requiring all townships and cities to provide a library to their residents, the revision would “fill the void” by *590 requiring all libraries to be available to all citizens. The provision was a replacement of a system that, while not working as intended, allowed all residents the full use of a library. The revision was intended to fix what was broken, not to remove from the citizenry the full use and enjoyment of libraries. And the intent behind the revision was clearly reflected in the convention debates and has been manifested by the legislative promulgation of regulations that allow the new system to work.
The majority trivializes the importance of the constitutional convention debate and incorrectly characterizes its content. Ante at 560-561 n 4. The majority states that it prefers to look to the “actual language” of the constitution rather than at how the delegates were discussing and describing its meaning. Ante at 560 n 4. But what the delegates understood the proposed constitution to mean has critical importance because it was their understanding that was then conveyed to the people in an effort to educate the people about the proposed amendments before the people voted on it in April 1963. In other words, the people derived their understanding of the constitutional language from what was written by those participating in the constitutional convention. So the explanation provided to the people was premised on the delegates’ understanding after having participated in the framing of the new text. It should come as no surprise, then, that the publication What the Proposed New State Constitution Means to You, written by the delegates and circulated to Michigan citizens, explained that “[t]he proposed new language emphasizes that ‘public’ libraries will be ‘available’ to residents without fixing how or where libraries shall be organized.” Id. at 81. The publication states *591 nothing about the proposed language guaranteeing only “general” library availability.[13]
The majority’s “generally available” theory has no basis in fact or logic and requires the belief that the citizens of Michigan willingly gave up the guarantee of a free, community-based, fully accessible library for the unknown of a possibly cost-based, possibly distant library that would have the authority to severely restrict usability. It requires one to accept that the people gave up not only their right to have a free library in their town, but also the right to borrow books from any library. This conclusion is incredible both as a basic premise and when viewed in the historical context of the constitutional amendment.
In 1963, when asked to ratify a constitutional amendment that would relieve communities of the burden of maintaining a library in exchange for ensuring that all libraries would be “available” to all people, the people of Michigan spoke. Pointlessly, the majority’s refusal to engage in a comprehensive attempt to understand that voice divests the citizenry of a right it gained through reasoned compromise. What was a practical and calculated exchange of rights at the time is lost today through imposing on clear language an amorphous postulation that is unsupported by both common sense and history.
*592 Article 11, § 1, of the 1908 Constitution, existing today as Const 1963, art 8, § 1, reads as follows: “Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.” At the constitutional convention, delegate Harold E. Bledsoe expressed alarm that the inherent purpose of promoting library availability to Michigan citizens was becoming overshadowed by some quibbling about the potential differences between city library funding and county and township library funding. Highlighting the prominence that Const 1908, art 11, § 1, should have over funding disputes in the interest of promoting the education of our citizenry, delegate Bledsoe eloquently stated as follows:
Now, to me, I cannot disassociate the means of education from libraries....
We must move forward and build libraries, big libraries, big schools, better schools, better libraries if we are to move forward and remove our nation from the position of a second class power in the field of science .... [1 Official Record, Constitutional Convention 1961, pp 830-831.]
Delegate Bledsoe, and countless others who share his views about the critical role education should be given in our society, would undoubtedly be saddened by today’s decision and by the story plaintiff tells of a young boy who, according to plaintiff, lives in a city that has no public library. Some students in the child’s class live in the township in which defendant is located and, thus, can borrow books from defendant and complete research and homework assignments with those resources. The young boy cannot. Consequently, defendant’s refusal to allow nonresidents to borrow books is disadvantaging this child academically.
*593 The majority’s decision will permit this story to be repeated endlessly across the state. For example, in rural areas that cannot afford to maintain their own libraries, there may not be a library for miles and miles around. If the residents of such an area can manage to reach a library, they must now be prepared to conduct their reading and research endeavors onsite. This is not what our citizens bargained for, and it is precisely the opposite of what the then-Michigan Governor extolled in 1962. Speaking to the Michigan Library Association, the Governor encapsulated the challenge facing Michigan to strengthen and expand Michigan libraries so that every person would have full access to this great resource. Governor Swainson stated:
Every resident of Michigan is entitled to good library service. It is imperative, therefore, that we continue our strides toward that goal. Access for everyone to the great funds of knowledge and information found in our libraries is essential. I cannot overstress the need for it. Our total library resources must be within the reach of everyone. Information and the means to obtain it are vital to our progress if we are to cope with the problems and complexities of today’s changing world. An enlightened public is indispensable to the preservation and progress of our democratic society. [Governor John B. Swainson, Library Service to the People of Michigan: Goals, Status, Progress, Michigan Library Association District Meetings 1962.
On May 1, 1963, shortly before our 1963 Constitution was ratified, United States Supreme Court Justice William J. Brennan, Jr., honored Law Day at the 75th anniversary of the Newark (New Jersey) Public Library. Justice Brennan explained that it was “most appropriate, and a most happy coincidence for [him], that the Library — so much an institution which has long been a staunch pillar of freedom, should celebrate its birthday on the very day which the Nation sets aside for recognition of the Rule of *594 Law and its contributions to liberty.” Brennan, Law, liberty & libraries, 88 Library J 2417, 2417 (1963). His speech eloquently cataloged the irreplaceable value libraries have in a free and educated society. Like me and scores of others, Justice Brennan understood that “[o]ne of the liberties we Americans prize most highly is our freedom to read what we wish and when we wish.” Id. at 2418.
While the doors of Michigan libraries remain physically open, the majority tramples the intent of our people by misinterpreting the law to the severe disadvantage of those who wish to educate themselves. As plaintiff queried, “Given the universal understanding that our libraries and their books exist to help us become better educated and more successful and informed citizens, one wonders why defendant seeks to make the books of our public libraries less available to the people, not more.” One wonders this same thing about the majority.
Milton E. Higgs, one of 144 candidates elected to serve as a delegate to the Michigan constitutional convention, is no less emphatic today than he was 45 years ago that the purpose of the constitutional amendment was to fully open public libraries to the citizens regardless of residency, and that this included the right to borrow books. Mr. Higgs states:
[T]he delegates considered and understood the impact of clear and unambiguous words being imbedded in the Constitution which would, as a matter of law, be binding on the Legislature and the Courts prohibiting abrogation of the right of all residents of this State pursuant to reasonable regulations to have access and borrow books from any “public” library in the spirit of ANDREW CARNEGIE who said, “THERE IS NOT SUCH A CRADLE OF DEMOCRACY UPON THE EARTH AS THE FREE PUBLIC LIBRARY, THIS REPUBLIC OF LETTERS, WHERE NEITHER RANK, OFFICE, NOR WEALTH RECEIVES THE SLIGHTEST CONSIDERATION.” [Affidavit of Milton E. Higgs, May 25, 2006.]
*595 Michigan citizens are poorer after today’s decision. Accordingly, I dissent.[14]
Weaver and Kelly, JJ., concurred with Cavanagh, J.

 Although I agree with the majority that the common understanding of the term “public library” at the time of ratification was that of an institution from which hooks could be borrowed, I note that the majority appears to divine that meaning from thin air rather than discuss how it may have reached it.

 Defendant argues that had the intent behind the constitutional amendment been to require all public libraries to offer all services to all people, the provision would have explicitly detailed the inner workings of the new library system. But the committee on education was strongly against including any specificity in the constitutional language for the good reason that it was the constitution. The committee delegates strove for brevity, something they specifically discussed during the convention debates. The committee conveyed that it was the Legislature’s place to legislate the details. See 1 Official Record, Constitutional Convention 1961, p 835 (“[T]he committee believed that this provision should be in this respect as broad and general in scope as possible. .. . [0]bviously we recognize that there must be qualifications, there must be reservations, there must be individual problems which must be met. And I submit that we cannot and we should not try to meet them in this constitution. Let’s leave that up to the legislative and statutory action.”). For obvious practical reasons, the delegates chose not to expound endless details about the library system in the constitutional language.

 I must correct the majority. It is not I who am leaving these details to the Legislature, ante at 564 n 9; it is the people of Michigan who left these details to the Legislature by ratifying a constitutional amendment that said precisely that.

 Although I cannot emphasize enough that the financial intricacies of our public library system are the Legislature’s domain, the majority grievously errs by blinding itself to the fact that libraries can protect themselves from the financial ruin the majority predicts simply by exercising their rights to charge a fee for nonresident book borrowing that fully reflects the cost of that service. MCL 397.561a.

 Not to the majority, however, which readily tosses aside the insights of these former delegates. See ante at 560-561 n 4. It must be irrelevant to the majority that the statements of the former delegates today are consistent with what they said at the convention 45 years ago.

 Curiously, plaintiff does not argue what the majority attributes to him. The majority states that plaintiff argues that he is entitled to the “borrowing rights equivalent to those of a township resident” and that “[ajnything less,.. . such as that which was offered by the township— library access with no borrowing privileges — violated the constitutional guarantee.” Ante at 557-558. To the contrary, plaintiff fully accepts that the constitutional language allows defendant and local library boards to *585 charge him a nonresident hook borrowing fee pursuant to MCL 391.561a. And in his efforts to borrow books from defendant, he offered to pay a fee accordingly. (Because plaintiff does not challenge the Legislature’s authority to allow such fees, I offer no opinion regarding whether such fees are permitted by the Constitution. Moreover, I believe such a discussion would be imprudent because that issue is not presented in this case, so I will not be baited into that discussion by the majority. See ante at 564-565 n 9. And while it should not be necessary, I will assist the majority by pointing out that questioning whether nonresident book borrowing fees may be unconstitutional is not inconsistent with my recognition that the statute does indeed permit them. See ante at 564-565 n 9.)

 Contrast the majority’s conclusion that the constitution ensures only the availability of libraries “in general” with its statement that it is “entirely ‘logical’ ” that the people ratified the provision “to achieve a reality of greater library access.” Ante at 566 n 11 (emphasis omitted). I fail to see how a belief that the people were attempting to achieve a reality of greater library access is consistent with the conclusion that the constitution guarantees the people nothing more than the existence of a hook lending library somewhere in the state. Moreover, the majority could not be more wrong that “history in this regard has proven the people right” after today’s decision. See ante at 566 n 11.

 Defendant declined during discovery to provide information about the costs of providing library services to nonresidents; thus, it is impossible to comment about the fairness, or lack thereof, of the price it demanded from the city of Bloomfield Hills in the contract renewal negotiations. But for the interested reader, the city had been paying $226,460 annually, and the township asked for $463,550 annually in the contract that failed.

 The MichiCard is a statewide library card that allows holders of the card to use the services, including book borrowing, of any participating library in the state. Participating libraries are reimbursed by the state for postage costs incidental to shipping books to patrons, as well as the replacement costs of items that are not returned.

 In fact, not only can plaintiff not borrow books from defendant, defendant also refuses to allow plaintiff to use the Internet at the facility. And while nonresident children can use the Internet in the “Youth Room,” they are denied remote access to the system.

 I proudly note that Michigan citizens were the first in the nation to bestow upon themselves a constitutional right to access a library.

 Curiously, the majority cites the statistic mentioned in this sentence, ante at 566 n 11, but ignores the context in which the statistic was used — namely, to emphasize the need to make libraries fully available to all people.

 I can locate nothing from any other organization attempting to educate its members about the proposed constitutional changes that conveys a contrary understanding. Rather, the people of Michigan were being informed that the constitutional amendment expanded library service. For example, the brochure circulated by the League of Women Voters informed the League’s members that “ [provisions for the handicapped and for libraries are broadened.... The legislature is called on to provide for establishment and support of libraries ‘available to all residents’.” It’s Your Choice: The 1908 or the 1963 Constitution, The League of Women Voters of Michigan, November 1962, p 16.

 Because this issue can be resolved by properly interpreting the constitutional language, I would not reach the questions whether defendant’s practices violate plaintiff’s rights to due process or equal protection.